Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5590 | **DATE** | 6/13/2001 |
| **CASE TITLE** | Pamela Grant vs. Murphy & Miller | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ______.

(3) ☐ Answer brief to motion due______. Reply to answer brief due______.

(4) ☐ Ruling/Hearing on ______ set for ______ at ______.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ______ set for ______ at ______.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ______ set for ______ at ______.

(7) ☐ Trial[set for/re-set for] on ______ at ______.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ______ at ______.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in this memorandum opinion and order, Murphy & Miller's motion is denied in principal part and granted to a lesser extent. (15-1) Grant's motion to strike the declaration of Pattie Miller and Defendant's motion to strike are denied as moot. (27-1, 38-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | JUN 14 2001 — date docketed |
| | Notified counsel by telephone. | docketing deputy initials |
| | Docketing to mail notices. | 6/14/2001 — date mailed notice |
| | Mail AO 450 form. | SN — mailing deputy initials |
| | Copy to judge/magistrate judge. | |

SN — courtroom deputy's initials

ED-7 FILED FOR DOCKETING 01 JUN 14 AM 7:37

Date/time received in central Clerk's Office

Document Number 45

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAMELA GRANT, )
)
Plaintiff, )
)
v. ) No. 99 C 5590
)
MURPHY & MILLER, INC., )
)
Defendant. )

DOCKETED
JUN 14 2001

MEMORANDUM OPINION AND ORDER

Pamela Grant ("Grant") has charged her former employer Murphy & Miller, Inc. ("Murphy & Miller") with a number of violations of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e to 2000e-17: sexual harassment, retaliation and disparate treatment sex discrimination. Murphy & Miller has moved for summary judgment on all of Grant's claims under Fed. R. Civ. P. ("Rule") 56, and both sides have purported to comply with--but have really not conformed to--this District Court's LR 56.1.[1] For the reasons stated in this memorandum

[1] As explained in the Appendix, both parties' approach to the LR 56.1 process has frustrated its goal of facilitating the resolution of Rule 56 motions through evidentiary statements and responses to such statements (in each instance with record citations) that highlight the existence or nonexistence of factual disputes. This opinion will cite to Murphy & Miller's LR 56.1(a)(3) statement as "M. St. ¶--," to Grant's LR 56.1(b)(3)(B) statement of additional facts as "G. St. ¶--," and to the parties responses to those statements as "M. Resp. ¶--" and "G. Resp. ¶--." But because of the flawed nature of those submissions, it is often more convenient and informative to cite directly to relevant deposition testimony by stating the deponent's name, followed by whether the deposition was state ("S.") or federal ("F.") and then the page and line citations (with the page citation preceding, and the line citation following, a colon).

45

opinion and order, Murphy & Miller's motion is denied in principal part and granted to a lesser extent.

Summary Judgment Standards

Familiar Rule 56 principles impose on Murphy & Miller the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (St. Louis N. Joint Venture v. P & L Enters., Inc., 116 F.3d 262, 265 n. 2 (7th Cir. 1997)). As Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999) has more recently quoted from Roger v. Yellow Freight Sys., Inc., 21 F.3d 146, 149 (7th Cir. 1994):

> A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

While that general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue (Miller v. Borden, 168 F.3d 308, 312 (7th Cir. 1999)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standard (id.). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could find in favor of Grant (see Fuka v. Thomson Consumer Elec., 82 F.3d 1397, 1402 (7th Cir. 1996) and cases cited there). As with every summary

judgment motion, this Court accepts nonmovant Grant's version of any disputed facts where it is arguably supported by the record.

## Background

Murphy & Miller is a company that specializes in the installation and maintenance of heating and cooling systems in commercial buildings (M. St. ¶2). During her tenure there Grant worked as the administrative assistant to Vice President of Service Charles Gagnon ("Gagnon") (id.). Grant contends that while at Murphy & Miller she was a victim of sexual harassment, mostly on Gagnon's part, and that he eventually fired her because she did not succumb to his advances (G. Mem. 9-11). Grant has also set forth claims of retaliation and disparate treatment sex discrimination.

Most of the significant facts tendered by the litigants pertain to Grant's sexual harassment claim, and this opinion will address those first, then will go on to discuss the legal aspects of that claim. After that discussion is completed, the same procedure will be followed as to Grant's other claims.

## Grant's Work at Murphy & Miller

Grant was hired by Gagnon as his administrative assistant on September 10, 1996[2] (G. St. ¶6). In that capacity she worked with Gagnon extensively and he referred to her as his "right hand

[2] Gagnon had interviewed Grant for the position on July 29, 1996, and he personally made the decision to hire her (G. St. ¶¶6, 10).

person" (M. St. ¶3; G. Resp. ¶3). Not only did Grant's job call for her to interact with Gagnon frequently (see M. St. ¶3), but the layout of their respective offices meant that they worked in close proximity. Their offices were situated approximately 20 feet apart and were adjoined by a door and a window (Gagnon F. Dep. 60:12-15).

Gagnon held a position of substantial importance at Murphy & Miller. As its Vice President of Service he was in charge of the day-to-day operations of two of Murphy & Miller's five departments: the service operation and the installation operation (Gagnon F. Dep. 6-7; P. Miller S. Dep. 12:2-20).[3] Gagnon not only had authority to hire employees but appears to have had unilateral authority to fire individuals as well.[4] On the service side Gagnon was responsible for approval of large

[3] Pattie Miller's testimony left some ambiguity about Murphy & Miller's precise organizational structure, but it is clear enough from the record that Gagnon headed up both the service and installation divisions at Murphy & Miller (P. Miller. S. Dep. 12:19-20).

[4] As already stated, Gagnon hired Grant for the administrative assistant position. Gagnon's authority to terminate Murphy & Miller employees is somewhat less clear. At one point Murphy & Miller co-owner Pattie Miller stated that he did not possess such authority (P. Miller S. Dep. 62:23 - 63:1), and Gagnon reluctantly agreed to that position in his deposition (Gagnon F. Dep. 124:12-16), although he did temper that by saying, "If I really pushed it, I could have [unilaterally fired an employee]" (Gagnon F. Dep. 124:5-7). Indeed, Pattie Miller herself elsewhere testified that Gagnon fired Grant on his own volition on September 2, 1997 (P. Miller S. Dep. 24:7-9, 48:7-8 and 50:22-24). More on that subject later.

maintenance contracts (Kerr F. Dep. 44). Finally, although the record is not precise as to the identity of Gagnon's direct supervisors during his tenure as Vice President of Service, it is a fair inference that he reported directly to Murphy & Miller co-owners Jim and Pattie Miller and had no direct supervisors within the departments that he oversaw[5] (P. Miller S. Dep. 6:15 - 7:6; Gagnon S. Dep. 6).

As Gagnon's administrative assistant, Grant was privy to confidential information (Grant F. Dep. 23:7-9). For example, as part of her duties she had access to Murphy & Miller's customer list and was told about impending terminations on several occasions (Grant F. Dep. 23:12 - 24:1). There is no contention that she ever disclosed any such information. Gagnon had also asked Grant to inform him about the job activities of several employees during her employment, and she had done so when asked (M. St. ¶3). By all accounts Grant had performed well in her administrative assistant position throughout her time at Murphy & Miller up to the event relating to the departure of Murphy & Miller's Service Manager Greg Obert ("Obert"), discussed later in this opinion (G. St. ¶11).

---

[5] In about October 1998 Gagnon was promoted from Vice President of Service to Vice President of Operations (Gagnon S. Dep. 5:2-7). In that new position he reported directly to Jim and Pattie Miller (id. 6:14-15). Though there is no specific testimony as to whether Gagnon had reported directly to any other individuals at Murphy & Miller in his prior position, that does not appear to have been the case.

Grant's Allegations of Sexual Harassment

Shortly after Grant began working at Murphy & Miller, Gagnon began to make comments to Grant that in some cases clearly and in other cases arguably contained sexual overtones. Those instances included the following litany, set out in M. St. ¶14 and paraphrased here:

1. About 3 or 4 times between September and December 1996, Gagnon told Grant that she was "attractive" or "pretty" (M. St. ¶14a).

2. Between September and December 1996 Gagnon made two comments about Grant needing a man. On one occasion Gagnon told Grant that he had hired her because "she was a warm, considerate people person" and that she "shouldn't be alone" but "needed a man in her life." On the second occasion Gagnon told Grant she was a "very attractive woman" and that she "needed someone in her life" (M. St. ¶14 b; G. Resp. ¶14 b).

3. In mid-to-late November 1996 Gagnon told Grant that he could not terminate another employee, Evelyn Vogrich ("Vogrich"), until some time had passed because he had to ensure that "he had said no sexual remarks" to Vogrich. Gagnon also relayed to Grant that he had held a conversation with Vogrich about her purchase of some new teddies and as to whether Vogrich was wearing "things sexy enough" with her

boyfriend (M. St. ¶14 c).

4. About October or November 1996 Gagnon questioned Grant about why Dick Torchal ("Torchal"), a co-worker in the Construction Department, regularly visited her desk during working time. Gagnon asked what was "going on" between her and Torchal and commented that "men have sex on their minds all the time" (M. St. ¶14 d; Grant F. Dep. 39).

5. From January through early August 1997 Gagnon made 2 or 3 comments per week about Grant being "attractive." For example, on one occasion he commented on how fit she was and how she stayed so slim. Another time Gagnon saw Grant eating something and said she "was going to get fat." When Grant pointed out that the item was fat free, Gagnon said, "Oh, don't you dare lose a bit of weight. I've spoken to every man in this company and they think you are perfect the way you are." Another time Gagnon said that he recalled meeting Grant during the hiring process and thought she "dressed well." Gagnon also commented that Grant "needed to be with somebody" (M. St. ¶14 e).

6. On two occasions in summer 1997 Gagnon asked Grant why she did not grow her nails long, and he commented that "there is nothing hotter than a woman with long painted nails" (Grant F. Dep. 103:20 - 104:15).

7. On two occasions Gagnon asked Grant why she did not

wear heels. In one of those Gagnon said "there is nothing sexier than a woman in heels, because you can see her shapely calf muscles." On the other occasion Gagnon stated that they make women "look sexy" (M. St. ¶14 g).

8. In March 1997, while Gagnon and Grant were alone in Gagnon's office, Gagnon mentioned to Grant that his wife "didn't seem to be interested in sex anymore." Gagnon then had about a 15 minute conversation with Grant that included the following exchange (M. St. ¶14 h; Grant F. Dep. 118-19):

> Gagnon: "What if a person were attracted to another person and he went with those feelings?"
>
> Grant: "If the person is married it would be wrong."
>
> Gagnon: "But what if he was just so attracted to another woman that he just wanted to pursue this?"
>
> Grant: "It's wrong. The wife would get hurt. And if he wanted to do that he should get a divorce."

During the course of that conversation, Gagnon persisted in asking Grant why it would be so wrong to engage in an extramarital affair.

Murphy & Miller's Sexual Harassment Policy

Murphy & Miller began to take steps to prevent sexual harassment at the company in 1996. It created a human resources department and began the drafting of an employee handbook (M. St. ¶¶10-11). As part of that initiative, in December 1996 it adopted a draft of a policy entitled "Sexual and Other

Harassment" (see M. St. ¶11; M. Ex. D).

That draft policy was distributed and discussed in a December 1996 managerial meeting at which Gagnon was present, but it was not issued to all employees until 1999, when an employee handbook was issued for the first time (M. St. ¶11; G. St. ¶129). At some unspecified point during Grant's employment she became aware that Murphy & Miller was "starting to put together a handbook" that contained such a policy (Grant F. Dep. 154). But there is no indication in the record that Murphy & Miller implemented any sexual harassment training for its employees or managers at any time.

In addition to that uncirculated draft policy, Murphy & Miller had an "open door" policy under which employees were encouraged to speak to the Millers or to any other manager about any job-related problems (M. St. ¶12). Pattie Miller also held at least two meetings for the female employees of the company, one in late 1996 and one in the summer of 1997 (M. St. ¶13). Grant did not attend either of those meetings (id.)

Grant's Reaction to Gagnon's Harassment

In December 1996 Grant met with Pattie Miller to discuss how her job was going (Grant F. Dep. 78). During that meeting Grant mentioned the conversation that Gagnon had held with her about Torchal, saying that it had upset her (Grant F. Dep. 79). Although the record does not reflect Pattie Miller's precise

response on that subject, Grant opined that Pattie Miller "seemed a little shocked" that Gagnon would have said that (id.). But Pattie Miller did not pursue the matter and did not ask Grant why the conversation had upset her (id.). Grant said nothing more on the subject (id.).

Other than that occasion, Grant did not tell anyone in Murphy & Miller's management about Gagnon's conduct (M. St. ¶22). In her deposition she said she had been reluctant to speak with Pattie Miller because she believed her comments would not be kept confidential (Grant F. Dep. 248). Grant had, however, told Murphy & Miller salesman Hugh Kerr ("Kerr") about Gagnon's behavior three months into her employment (Grant F. Dep. 108-09). Kerr then gave Grant the name of a governmental agency,[6] which she called in December 1996 (Grant F. Dep. 109; M. St. ¶20; G. Resp. ¶20). But because the agency had told her to be prepared to lose her job if she took action, Grant decided not to file a charge or to pursue any relief with the agency (M. St. ¶20; G. Resp. ¶20).

Grant's Termination

August 1997 brought about important developments in Grant's situation. First, early in that month Gagnon stopped making any comments of a sexual nature toward Grant, ceasing the 2 to 3

[6] Though Grant referred to the agency as the "Labor Board," when questioned on the subject she said she could not be sure of the agency's name (Grant F. Dep. 110).

comments per week (at a minimum) that he had been making about her appearance for some eight months (Grant F. Dep. 85:5-8). Second, during that month Service Manager Obert told Grant that he intended to resign from the company and asked her to keep that information confidential (Grant S. Dep. 57-59).

Grant did not divulge that Obert confidence to anyone at the company (Grant S. Dep. 58). When Obert did resign, Gagnon and Pattie Miller were upset--Obert had access to Murphy & Miller's customer list and other information that could potentially have allowed a competitor to underbid Murphy & Miller (Grant F. Dep. 181:3-6; Gagnon S. Dep. 23:5-10).

Shortly thereafter Gagnon asked Grant whether she had been aware that Obert intended to leave, and she said that she had been (Grant S. Dep. 66:8-11; 67:11-14).[7] After learning that, Gagnon and Pattie Miller called a disciplinary meeting with Grant on Friday afternoon August 29, 1997 (Grant S. Dep. 70:24 - 71:2).

During that meeting Gagnon and Miller scolded Grant for not telling anyone in Murphy & Miller management about Obert's intended departure (Grant S. Dep. 73). They told her that they might have been able to talk Obert out of resigning if she had

[7] Although Gagnon took the position that he would have expected anyone on his management team to have disclosed such information, he had no recollection of asking anyone else whether they had been aware of Obert's intended departure (Gagnon S. Dep. 46:11 - 47:13). Nor did any evidence suggest that had ever been the subject of any company policy.

told them about his impending resignation (Grant F. Dep. 183).[8] Gagnon also said that in the future he would expect Grant to disclose any knowledge she had that other key employees intended to resign. But Grant responded that if another employee were to tell her in confidence of plans to depart, she did not feel she could inform Murphy & Miller management in violation of that confidence (M. St. ¶8; G. Resp. ¶8).

After that meeting Gagnon and Miller met to discuss what to do about Grant. Gagnon expressed severe doubt that he could work with Grant in the future, given the Obert incident and Grant's reaction to the meeting (P. Miller S. Dep. 49-50). Pattie Miller responded that the situation did not look promising but that she wanted to give Grant the weekend to allow her to reconsider her position (id. 48:13-17 and 50:13-16) No termination decision was made on that Friday (P. Miller S. Dep. 22: 17-18, 23:15-17 and 24:7-10).

But on the following Tuesday (September 2, 1997), despite the fact that no termination decision had been reached in the Pattie Miller-Gagnon meeting, Gagnon fired Grant on his own (P. Miller S. Dep. 48:7-8; 50: 22-24)--an action totally at odds with the portion of Murphy & Miller's evidence that claimed he did not

---

[8] But the fact is that neither Gagnon nor Pattie Miller attempted to dissuade Obert from leaving after he had announced his resignation, nor did they ever communicate with him in an effort to persuade him to return to the company (Gagnon S. Dep. 32-35).

have the authority to do so unilaterally (see n.4).[9] And Gagnon fired Grant without even giving her the opportunity to reconsider her position (Gagnon S. Dep. 53:20-22 and 101:23 - 103:10), as Pattie Miller had wanted.

There is no indication in the record that Murphy & Miller had ever even scolded, let alone fired, any other Murphy & Miller employee for not disclosing knowledge of another employee's departure. Before the Obert incident Grant had never been told (either in her written job description or orally) that she had any affirmative duty to let Murphy & Miller management know when she was aware that some "key" employee intended to resign (Gagnon S. Dep. 43:1 - 44:5; 72:9-12).[10] Nor was Grant's successor June Caruso ("Caruso") ever told about that purported predicate for Grant's firing--or (more importantly for present purposes) that she had any obligation to inform Murphy & Miller management if she became aware at any time that a key employee intended to resign (Gagnon S. Dep. 81:8-11 and 95:5-16).

Sexual Harassment Claim

Although the parties have discussed Grant's sexual harassment claim in the older conventional terms of "quid pro

---

[9] Rule 56's requirement to draw reasonable inferences in Grant's favor calls for the rejection of the last-mentioned portion of the Murphy & Miller evidence in favor of the conclusion that Gagnon did possess the authority that he actually exercised.

[10] See n. 7.

quo" and "hostile environment" harassment, that approach ignores the word from on high that has abandoned those characterizations in favor of distinguishing between cases based on whether the harassing supervisor did or did not take a tangible adverse employment action against the complaining subordinate (Mosher v. Dollar Tree Stores, Inc., 240 F.3d 662, 666 (7th Cir. 2001), citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 760-65 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)). When a plaintiff proves that a tangible adverse employment action (such as termination) has been conjoined with plaintiff's refusal to submit to a supervisor's sexual demands, he or she has "establishe[d] that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII" (Ellerth, 524 U.S. at 753-54). But for any sexual harassment that preceded the employment decision to be held actionable, the supervisor's conduct must have been severe or pervasive (id. at 754).

Here Grant essentially contends that she is entitled to relief both because Gagnon's harassment culminated in a tangible employment action (her termination) and because the harassment she suffered at Murphy & Miller before her termination was severe or pervasive.[11] Those claims will be discussed in turn. But

[11] For lack of a better term, this opinion employs the pre-Ellerth "hostile environment" terminology in referring to Grant's claim that she suffered severe or pervasive harassment.

before that is done, this opinion addresses the preliminary issue of whether and to what extent any of the conduct upon which Grant relies in support of her sexual harassment claim is time-barred.

Title VII imposes a 300-day statute of limitations for filing a charge with EEOC (Minor v. Ivy Tech State Coll., 174 F.3d 855, 857 (7th Cir. 1999)). For that purpose a plaintiff may not base her sexual harassment action on conduct that occurred outside of that 300-day period unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct--for example, where the conduct could constitute, or be recognized, as actionable harassment only in light of events that occurred later and within the limitation period (id.; Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1166-67 (7th Cir. 1996)).

In this instance Grant filed her EEOC charge on February 17, 1998 (First Amended Complaint ¶4). Murphy & Miller contends that Grant should not be allowed to rely on any alleged acts of harassment that fell outside of the 300-day period (before April 23, 1997) because Grant "believed that she had a potential claim as early as December 1996" when she called the "Labor Board" to make a complaint (M. Mem. 3). That contention fails on two grounds.

First, although Grant indisputably placed that phone call, the relevant question in terms of actionability is whether she

should have sued at that time. That inquiry poses little if any difficulty--after all, Grant was not fired until September 2, 1997, and the import and impact of Gagnon's earlier actions were not really felt until then. And in terms of Grant's purported obligation to have sued as of December 1996 (as Murphy & Miller contends), up to that point Gagnon had told her only 3 or 4 times that she was attractive, he had twice told her that she "needed a man in her life," he had told her about his "things sexy enough" conversation with Vogrich and he had questioned her once about "what was going on" between her and office colleague Dick Torchal. Because those instances by themselves would not have triggered even an arguable claim of severe or pervasive harassment, Grant cannot be characterized as unreasonable in having failed to sue at that point.[12] And that is so even without reference to the statement of the government agency personnel to Grant that she could expect she might be fired if she lodged a formal complaint (let alone her filing a lawsuit)--a fact that could obviously bear on the issue of reasonableness.

But even if that had not been so--even if it were to be considered that only Gagnon's conduct from and after April 23,

[12] Indeed, it can safely be said that if Grant had sued on such a claim at that earlier date, this Court would doubtless have been confronted with a Murphy & Miller summary judgment motion challenging the claim as insufficient in law--a motion with a far greater prospect of success than its motion now under consideration.

1997 could serve as the basis for a timely claim--the pre-April 23 conduct would still have been relevant, and hence admissible in evidence, on such issues as Gagnon's (and hence Murphy & Miller's) unlawful intent. So it is true from more than one perspective that Grant may rely on all of the acts she has identified--both before and after April 23, 1997--in support of her sexual harassment claim. With that settled, this opinion will now turn to the merits of that claim.

## Necessary Causal Relationship

As already explained, when a plaintiff proves that a tangible adverse employment action has stemmed from his or her refusal to submit to a supervisor's sexual demands, that shows the employment decision itself to have constituted a change in the terms and conditions of employment that is actionable under Title VII (Ellerth, 524 U.S. at 753-54). To establish that the harassment culminated in a tangible employment action, a plaintiff must establish a causal relationship between the harassment and the action (see Johnson v. West, 218 F.3d 725, 731 (7th Cir. 2000)). But a victim need not provide evidence of a direct and express sexual demand, for such a claim may be established through statements that, though less than such direct and express demands, "allow 'inferences [to be] drawn from the observable facts'" (Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1312 (11th Cir. 2001), quoting earlier Eleventh

Circuit caselaw).

As stated earlier, Grant contends that Gagnon fired her because she did not respond to his advances. Because a jury could certainly make such a finding reasonably, Murphy & Miller's motion for summary judgment as to that claim is denied. Gagnon made numerous comments to Grant that could reasonably be construed as sexual advances on his part. Those include Gagnon's repeated compliments about Grant's attractive appearance, his comments to the effect that she "needed a man" in her life and, perhaps most notably, his earlier-quoted March 1997 conversation with Grant while the two were alone in his office.

In terms of a link between Gagnon's conduct and Grant's termination, the circumstances as to her termination support the drawing of a reasonable inference that the two matters were causally related. Grant was fired only three weeks after Gagnon's harassment ended, too small a time gap to conclude as a matter of law--rather than leaving it to a jury to decide as a matter of fact--that his unsuccessful advances and Grant's termination were unrelated.[13]

[13] Indeed, a factfinder might reasonably conclude that Gagnon's sudden cessation reflected nothing more than a desire on his part to place some distance between his comments and Grant's ensuing termination. Such an inference is particularly reasonable in light of Grant's termination and his numerous earlier sexually-oriented comments to her--and that is especially true given Gagnon's statements to Grant about needing to make sure that some time had passed before he fired Vogrich, to ensure that he had "said no sexual remarks" to her.

Importantly, the factfinding jury could surely decide reasonably that Gagnon was both the alleged harasser and the decisionmaker.[14] Additionally, there are enough irregularities associated with Grant's firing to support a finding that the proffered reason for firing her was pretextual--again the following listing, though repetitious, sets out a paraphrase of several such items:

1. Gagnon fired Grant on his own despite Pattie Miller's stated desire to give Grant an opportunity to reconsider her position (see n. 4 and P. Miller S. Dep. at 48:13-17 and 50:13-16).

2. Before the Obert incident Grant had never been informed that she had an obligation to disclose information about her knowledge of the resignation of any "key" Murphy & Miller employee (Gagnon S. Dep. 43:1 - 44:5 and 72:9-12).

3. Although Gagnon claimed that he would have expected anyone in his management team to have disclosed knowledge of Obert's planned leaving, he had no recollection of asking

[14] M. St. ¶9 makes a contrary representation, indicating instead that the decision was made jointly by Pattie Miller and Gagnon. It is scarcely an accident that the law treats unfavorably, in inferential terms, any situation in which the harasser and decisionmaker are one and the same. By ignoring the evidence from Pattie Miller herself that points the other way (coupled with the mandate to draw pro-Grant inferences at this stage of the litigation), M. St. ¶9 is perhaps the most egregious example of Murphy & Miller's impermissible efforts to draw reasonable inferences in its own favor on this motion.

any other person at Murphy & Miller if he or she they had knowledge of the intended departure (Gagnon S. Dep. 46:11 - 47:13).

4. Gagnon did not tell Grant's successor Caruso (Gagnon S. Dep. 81: 12-14) why Grant had been fired, nor did he tell her that she had a purported duty to inform him if she were to receive information that any "key" Murphy & Miller employee intended to resign (id. 95:5-16).

Taken collectively, those circumstances would enable a jury to conclude reasonably that Grant's firing was pretexual. Murphy & Miller's proffered explanation does not preclude a reasonable determination by the factfinder that there was a causal connection between Gagnon's harassment and his decision to fire Grant.

Murphy & Miller asserts that it is entitled to summary judgment on the harassment claim because when Grant was asked during deposition whether Gagnon had "taken job action" against her as part of his harassment, she said "No" (Grant F. Dep. 148). But that appears to have been a function of a lay witness' response to a question framed in "lawyerspeak," for when Grant was asked more specific questions on the subject, she clearly explained that she believed she was fired because she did not succumb to Gagnon's advances (Grant F. Dep. 275-77). Again Grant, as the non-movant on the current motion, is entitled to

have all reasonable inferences drawn in her favor.[15]

In sum, when the Rule 56 standards are properly applied, Miller's motion for summary judgment on Grant's tangible employment action claim should never have been filed on the present record. It is denied.

Severe or Pervasive Harassment?

More difficult is the question whether Grant suffered hostile work environment harassment at Murphy & Miller before her termination. To be actionable on that score, the conduct complained of by Grant must have been subjectively and objectively "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (Smith v. Sheahan, 189 F.3d 529, 533 (7th Cir. 1999), quoting and adding emphasis to Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). As Smith, id. at 533-34 (internal citations and quotation marks omitted) has gone on to explain:

> In answering that question, courts must examine all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Although less severe acts of harassment must be frequent or part of a pervasive pattern of objectionable behavior in order to rise to an actionable level, extremely

[15] In this instance the problem was obviously created by the manner in which Murphy & Miller's counsel chose to frame the "taken job action" question.

serious acts of harassment do not.[16]

This issue obviously poses a much closer question than the one discussed in the preceding section. But Murphy & Miller is not entitled to summary judgment on Grant's hostile work environment claim either, because a reasonable jury could conclude that she suffered from pervasive harassment. Only a brief review of the already-set-out facts is required to show that.

First of all, Murphy & Miller does not dispute that Grant subjectively found the work environment to have been sufficiently hostile as to have changed the terms and conditions of her employment. Instead it contends essentially that the objective component is lacking. But it will be recalled that with the facts viewed in a light reasonably favorable to Grant, Gagnon hit on her at least two to three times a week over the course of approximately eight months--a pattern combined with other comments of a sexual nature. That factual matrix, in conjunction with the physical layout of their work spaces and the frequency with which they worked together (see Konstantopoulos v. Westvaco

---

[16] [Footnote by this Court] As the quoted language reflects, plaintiff must show either that the harassment was pervasive or severe, but not both. Thus Smith, id. at 534 held that a single event of harassment was actionable because it had been severe. Here, even though none of Grant's assertions rises to such a level of severity, the instances are sufficiently numerous so that taken together they could reasonably be found to have constituted pervasive harassment.

Corp., 112 F.3d 710, 717 (3d Cir. 1997), which found that an assignment to work in close proximity to a harasser was a significant factor in the totality-of-the-circumstances inquiry), would enable a reasonable finder of fact to find that Grant suffered pervasive harassment.

By way of attempted response, Murphy & Miller has sought to invoke the results reached in several Seventh Circuit cases, including Baskerville v. Culligan Int'l Co., 50 F.3d 428 (7th Cir. 1995). But Baskerville spoke only of nine comments (one of which may have been repeated) spread over a seven-month period (id. at 430)--a sharp contrast to the regular and frequent conduct by Gagnon in this case. And there (unlike here) the Court of Appeals concluded there had not been any propositions--either explicit or implicit--on the part of the alleged harasser (id. at 431).[17]

Hence there is also a triable issue of fact as to whether Grant suffered pervasive harassment during her employment with Murphy & Miller. Again summary judgment must be and is denied.

---

[17] To the identical effect, Baskerville, id. at 431 expressly cautions courts not to undermine the role of the jury by being too hasty to make legal determinations in relatively close cases or those "within the area of uncertainty." In that respect, see also Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir. 1998), explaining that the relatively narrow range of life experiences for most Article III judges makes sexual harassment claims particularly appropriate for jury resolution. Interestingly, Gallagher was authored by an extraordinarily distinguished senior District Judge with vast judicial experience, the Honorable Jack Weinstein.

Murphy & Miller's Legal Responsibility

With Grant having stated both a tangible employment action claim and a hostile work environment claim, the remaining question for actionability of those claims is whether Murphy & Miller can be held accountable for Gagnon's conduct. Here is the recent exposition of an employer's vicarious liability for the acts of its employees, as articulated in Johnson, 218 F.3d at 730 (internal citations and quotation marks omitted):

> Vicarious liability automatically applies when the harassing supervisor is either (1) indisputably within that class of an employer organization's officials who may be treated as the employer's proxy or (2) when the supervisor's harassment culminates in a tangible employment action....Absent either of these situations, however, an employer may avoid vicarious liability by showing (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by an employer or to avoid harm otherwise.

Murphy & Miller is not entitled to summary judgment on the basis of the last-described Ellerth affirmative defense because there are triable issues of fact as to both whether Grant's termination was causally related to Gagnon's harassment (already discussed at length) and whether Gagnon may be treated as a proxy of Murphy & Miller. In the latter respect it could well be sufficient that, as already stated, the record could fairly support the conclusion that Gagnon was the decisionmaker in Grant's firing. But there are the added and compelling facts that throughout the time relevant to this suit Gagnon headed up

two of five departments at Murphy & Miller, apparently outranked only by co-owners Jim and Pattie Miller in a company of 135 employees (P. Miller S. Dep. 10: 21-23). There can be no question that for Rule 56 purposes Gagnon was high enough in the company hierarchy to be treated as its proxy.[18]

Grant's Retaliation Claim

Next Grant also contends that she was fired in retaliation for her opposing certain hiring practices at Murphy & Miller that she believes violated Title VII. She predicates her retaliation claim primarily on these assertions, quoted directly from M. St.:

> 30. In December 1996, Plaintiff told Gagnon that she believed the Company should hire a particular African-American female applicant for a position in the Service Department. When Gagnon demurred that "the talk in the Department would cause a lawsuit if we hired this woman," Grant replied that the Company ought to be "solving the problem rather than catering to it."
>
> 31. During the December 1996 meeting between Ms. [Pattie] Miller and Plaintiff, Plaintiff informed Ms. Miller that the Service Department had not hired the African-American applicant and asked Ms. Miller if Gagnon was "prejudiced." Ms. Miller informed Plaintiff that she would investigate the situation.
>
> 32. Plaintiff told Ms. Miller about the African-American applicant situation pursuant to Ms. Miller's open door policy. Plaintiff did not intend to have Ms. Miller do

---

[18] Another example of the improperly skewed perspective that Murphy & Miller brings to the summary judgment table is its efforts to characterize Obert as being a member of "upper management" and a "key executive" (Gagnon S. Dep. 40-41; M. St. ¶4), while at the same time it attempts to downplay Gagnon's position. It obviously prefers to gloss over (or rather to ignore entirely) the fact that Gagnon was Obert's superior (Gagnon S. Dep. 7, 19).

anything to remedy the situation.

> 33. Ms. Miller questioned Anne Patterson, the Human Resources Manager, about the decision not to hire the African-American applicant and learned that the applicant did not get the position because it was given to a current employee.
>
> 34. Plaintiff also discussed the situation with Jeff Kordas ("Kordas"), the Company's Chief Financial Officer. Specifically, when Kordas asked Plaintiff how interviewing was going, she stated "We have a qualified candidate. We are not hiring her because she is African American....This is ridiculous." Kordas replied, "Unbelievable." They did not have any further discussion on the topic.
>
> 35. Plaintiff recommended her friend, John Kolrus, for the same Service Department position. When she asked Gagnon about hiring him, Gagnon told her that the Company could not hire him because he had "feminine mannerisms and would be eaten alive in the Dispatch Department." In response, Grant stated that the Company ought to "be solving the problem instead of catering to it."
>
> * * *
>
> 39. During Plaintiff's employment, the Company was involved in an effort to increase the number of minority employees to allow it to bid on work for the Chicago Board of Education. Plaintiff was involved in soliciting resumes from relevant graduate programs. When Ms. Miller called a meeting with Plaintiff to discuss the program, Plaintiff stated to both Jim and Pattie Miller that she felt like she was wasting her time because Gagnon never looked at the information she acquired, and thus the program was "going nowhere."

To present a prima facie claim of retaliation under Title VII, Grant must demonstrate[19] that (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment

---

[19] For Rule 56 purposes that means only the need to show a genuine issue of material fact on each of the elements of such a claim.

action and (3) there is a causal link between the protected expression and the adverse employment action (Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998)). As to the third of those components, Grant must show "that the protected activity and the adverse action were not wholly unrelated" (Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918 (7th Cir. 2000), quoting from earlier cases). To that end Sauzek, id. (citations omitted) teaches:

> Speculation based on suspicious timing alone, however, does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions. The mere fact that one event preceded another does nothing to prove that the first event caused the second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another.

Murphy & Miller is entitled to summary judgment on that claim because Grant has not established a prima facie case of retaliation in those terms. Even assuming that her statements to the Millers, Kordas and Gagnon could constitute opposition to protected activity, Grant has made no showing to suggest any connection at all between her termination and her complaints. Indeed, Grant conceded in her deposition that she was aware of no facts to connect those actions (M. St. ¶41; G. Resp. ¶41). Hence her retaliation claim is dismissed with prejudice.[20]

---

[20] Perhaps unsurprisingly, Grant's 30-page memorandum provides little analysis of the claim, with no discussion whatever of any claimed causal link between any of her asserted

Grant's Disparate Treatment Sex Discrimination Claim

Grant's final claim asserts that she was also the victim of disparate treatment sex discrimination.[21] After Grant was fired, Murphy & Miller salesman Kerr asked Gagnon about Grant's termination. When Gagnon told Kerr that he had fired Grant because she had not disclosed her knowledge of Obert's departure, Kerr said, "Well, I knew that Tom Greig was leaving and I didn't tell you, so why don't you fire me?" (Kerr S. Dep. 59). Gagnon told Kerr that Grant's situation was different because Obert had access to much more confidential information and that he expected Grant to tell him because she was his personal secretary (id.).

In this instance the components of a prima facie case call for Grant to demonstrate (in the same sense as stated in n. 19) that (1) she was a member of a protected class, (2) she was qualified for her position, (3) she was discharged and (4) others, similarly situated but not in her protected class, were treated more favorably (Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1142 (7th Cir. 1997)). Although Murphy & Miller concedes

---

opposition statements and her termination.

[21] Grant's First Amended Complaint does not distinguish her "sex discrimination" claim from her sexual harassment claim. Because sexual harassment is a subset of sex discrimination (Holman v. Indiana, 211 F.3d 399, 404 (7th Cir. 2000)), the parties' reference to Grant's final claim as a "sex discrimination" claim is ambiguous. As the text explains, her sex discrimination claim is really one charging disparate treatment.

the first three of those elements, it argues that Grant cannot meet the fourth element because she was not similarly situated to Kerr. In that regard Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)(internal citations omitted) has recently explained:

> In determining whether two employees are similarly situated a court must look at all relevant factors, the number of which depends on the context of the case. For example, in disciplinary cases--in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason--a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

Both Grant and Kerr dealt with Gagnon and were subject to his supervision. Both engaged in similar conduct: the failure to disclose information about the impending resignation of a Murphy & Miller employee. Grant had otherwise performed well in her job, and Murphy & Miller does not claim that her termination was related to any reason other than the Obert incident. But it first attempts to distinguish the situations of the two employees by claiming that unlike Kerr, Grant held "a special position of trust" and was hence subject to different standards (M. Mem. 12-13), and it also asserts that Greig did not hold a managerial position as did Obert, so that his departure did not have the

same potential ramifications (M. Mem. 13).

Those purported bases for distinguishing between Grant and Kerr could surely be viewed by a jury as a post-hoc rationalization. Not only was Grant never informed before the Obert incident that she held a "special position of trust," but Murphy & Miller never articulated guidelines--either before or after Grant's firing--that stated certain employees had duties to disclose information about impending resignations of key employees while others did not. Importantly as to Murphy & Miller's credibility, it has already been pointed out that even after Grant's termination it did nothing to inform company employees--including Grant's successor Caruso--of any such obligation. And as for labeling Obert's departure as potentially more disruptive, a reasonable factfinder could well find that assertion unworthy of belief in light of the other problematic aspects of Murphy & Miller's claimed explanation.

Murphy & Miller also contends that because it hired Grant in the first place and hired a woman as her successor, there is no force to her sex discrimination claim. That however is not dispositive as a matter of law, though it may well be considered by the jury as a factor weighing against Grant's claim. In light of what has been said on Grant's side of the balance scales, together with the potential for a reasonable factfinder's rejection of Murphy & Miller's stated explanation for having

terminated Grant, its motion for summary judgment with respect to that claim is denied as well.

Conclusion

Because of the absence of a genuine issue of material fact as to that facet of Grant's claims, Murphy & Miller's motion for summary judgment is granted as to Grant's retaliation claim. But the presence of such material factual issues as to all other aspects of the case compels the denial of the Murphy & Miller Rule 56 motion as to Grant's sexual harassment and sex discrimination claims.

Milton I. Shadur
Senior United States District Judge

Date: June 13, 2001

## Appendix

Despite the clarity of the LR 56.1 format and that rule's directives, in this instance counsel for both parties have taken inappropriate liberties with that process. At several important junctures, counsel for Murphy & Miller has simply overstated the record and drawn inferences in the company's own favor, flouting the basic ground rules of Rule 56 litigation. Not to be outdone, counsel for Grant has improperly denied certain statements of material fact and has also seen fit to file a counterstatement of almost 300 assertedly material facts that lack any organizational consistency and that in many instances are totally irrelevant to the current motion.

Those collective failures have unfairly thrust upon this Court the task of scouring the record (including both federal and state depositions of several deponents in their entirety) to determine what material facts are disputed or undisputed. As our Court of Appeals has pointedly said more than once in the appellate context (Ehrhart v. Secretary of Health and Human Servs., 969 F.2d 534, 537 n.5 (7th Cir. 1992), quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)(per curiam)):

> Judges are not like pigs, hunting for truffles buried in briefs.

And there is even less justification for forcing a judicial truffle hunt in the present circumstances, where an entire bulky record rather than only the litigants' briefs is involved.

That situation might well justify the threshold rejection of

a Rule 56 motion where as here the movant has wrongfully claimed the benefit of favorable inferences--after all, the only consequence of the motion's denial is to put the parties to their proofs at trial. As the opinion reflects, this Court has not done that, instead shouldering the burden that should have been borne by Murphy & Miller. And because it turns out that the bulk of the Murphy & Miller motion should never have been advanced because of the obvious existence of material factual disputes, this Court will consider the propriety of some incremental shifting of attorneys' fees if Grant were ultimately to lose the case but her counsel has been forced into unnecessarily duplicative work by the mostly ill-considered Rule 56 motion.

There is another aspect of the current motion that merits supplemental treatment in this Appendix, rather than interrupting the flow of analysis in the opinion itself. Both parties have filed Motions To Strike in addition to their LR 56.1 submissions. Grant has sought to strike the Declaration of Pattie Miller on the basis that much of her Declaration is contradicted by her deposition testimony or is based on hearsay. Murphy & Miller has filed a more generalized motion to strike, which targets a number of asserted material facts set forth by Grant as well as several arguments contained in her memorandum in opposition to summary judgment.

Grant's motion to strike requires little attention. Most of

her objections to Pattie Miller's Declaration are erroneously asserted hearsay objections that involve nonmaterial facts. One item, though, is worth noting: Declaration ¶6 asserts that both Pattie Miller and Gagnon made the decision to hire Grant, an assertion that conflicts with a number of portions of Pattie Miller's testimony. Because Grant and not Murphy & Miller is entitled to the benefit of favorable inferences, the opinion reflects at several points that the Declaration's statement is not credited. But Grant's objection is more appropriately raised in her LR 56.1 materials, not as an evidentiary objection to the admissibility of Pattie Miller's Declaration.

As for Murphy & Miller's motion to strike, this Court will not perform an exhaustive line-by-line analysis of that motion because it has taken care to ensure that its opinion is based only on admissible evidence.[1] But there are a few aspects of Murphy & Miller's motion that call for greater attention because they seek to exclude facts or arguments that have factored significantly in this Court's analysis.

First, Murphy & Miller's objection in its Motion ¶6 is

---

[1] Moreover, any such effort could convert this already overly lengthy effort into near-novella length. For example, Murphy & Miller's submission contains such absurdities as this bizarre nit-pick in Motion ¶7:

> Plaintiff testified that Gagnon merely asked why she did not wear heels and allegedly commented that they were "sexy;" he never suggested that she wear them.

simply wrong. Grant testified during her federal deposition that Gagnon made repeated comments about her appearance "until about three weeks before I was let go" (Grant F. Dep. 85).

Second, Motion ¶8 seeks to deny Grant the benefit of the reasonable inference that Gagnon's repeated comments toward Grant were implicit propositions or sexual advances on his part. That objection is also rejected.

Third, Motion ¶9 highlights the factual disputes that exist with respect to Grant's termination and Gagnon's authority within the company. Although Grant's counsel does make several unsupported assertions about Gagnon's authority, the opinion has instead detailed those portions of the record that reflect his possession of substantial authority.

Fourth, Motion ¶23 is simply baseless in stating:

> Plaintiff's assertion that the decision to fire her was solely that of Gagnon must be stricken as unsupported by the record.

That position is totally at odds with Pattie Miller's testimony at her S. Dep. 22:17-18, 23:14-15, 24:7-9, 46:20-24, 48:7-19 and 51:23-52:2. In light of that substantial amount of deposition testimony from Pattie Miller to the effect that Gagnon unilaterally fired Grant, it is difficult to view Murphy & Miller's counsel as having made the quoted Motion ¶23 assertion in good faith.